IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-30193

_____

BOSTON OLD COLONY INSURANCE CO,

　　　Plaintiff - Counter Defendant - Appellee-Cross Appellant,

STATE OF LOUISIANA, through the Office of Risk Management,
division of Administration, Office of the Governor;
LOUISIANA PUBLIC BROADCASTING,

　　　Intervenor Plaintiffs-Appellees,

v.

TINER ASSOCIATES INC, Etc; ET AL,

　　　Defendants,

HRC ARMCO INC,

　　　Defendant - Intervenor Defendant - Cross Defendant -
　　　Appellee,

and

STAINLESS INC,

　　　Defendant - Intervenor Defendant - Appellee,

and

ALLIED RESOURCE MANAGEMENT OF FLORIDA INC,

　　　Defendant - Intervenor Defendant - Cross Claimant -
　　　Cross Defendant - Appellee,

v.

GENERAL STAR INDEMNITY CO,

　　　Defendant - Intervenor Defendant - Cross Defendant -
　　　Third Party Plaintiff - Counter Claimant -

Appellant-Cross-Appellee,

v.

MARINE OFFICE OF AMERICA CORPORATION; NATIONAL
UNION FIRE INS CO OF PITTSBURGH, PENNSYLVANIA,

Third Party Defendants - Appellees.

--------------------
Appeals from the United States District Court
for the Western District of Louisiana, Monroe
--------------------
April 9, 2002

Before HIGGINBOTHAM, DeMOSS, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

This case arises from the collapse of a television transmission tower owned by KNOE Television ("KNOE") in Riverton, Louisiana. Most of the claims resulting from the tower's collapse were resolved on summary judgment. A jury awarded over $4 million in damages to KNOE's first party insurer, Boston Old Colony ("BOC"), and against General Star Indemnity Co. ("General Star"), the excess liability insurer for Tower Network Services ("TNS"). General Star appeals from a number of summary judgment and evidentiary rulings of the district court. In turn, BOC cross-appeals on two issues relating to the district court's judgment on the jury verdict. After a review of the relevant facts, we address these issues in turn.

FACTUAL AND PROCEDURAL BACKGROUND

On March 20, 1997, a television transmission tower owned by KNOE collapsed and was completely destroyed. Before the collapse, KNOE had contracted with TNS for maintenance and repair work on the

2

tower.  At the time of the collapse, a repair crew was working on the tower, installing "diagonals," thin metal rods which prevent the tower from twisting.  The post-accident investigation indicated that the sole cause of the incident was the failure on the part of the tower crew to use a temporary brace to support the tower during the removal of the diagonals, which resulted in the tower becoming unstable and collapsing.

TNS is a contractor specializing in the repair and maintenance of towers.  Before the collapse, TNS had contracted with HRC Armco, Inc. ("Armco") for administrative employee services.  In turn, this contract was assigned to Armco's sister corporation, Allied Resource Management of Florida ("Allied").  Thus, Allied actually paid the tower crew and performed a number of other administrative functions in relation to the workers.

Due to the destruction of KNOE's tower, a new tower was built. Before the collapse, KNOE was using the tower to broadcast its signal.  Louisiana Public Broadcasting ("LPB") was also using the tower pursuant to a philanthropic donation of space on the tower by the owner of KNOE, which would expire in 2005.  After the new tower was built, KNOE leased tower space to LPB for a period of 40 years, in exchange for a one-time payment of $1.1 million.

BOC, the first party insurer of KNOE, made payments to or on behalf of KNOE of approximately $5 million for the new tower and transmitter, business interruption losses and other expenses related to the loss.  On May 22, 1997, BOC  filed a Petition for

3

Damages in Louisiana state court against TNS; TNS's primary liability insurer, Nautilus Ins. Co. ("Nautilus"); TNS's excess liability insurer, General Star; Armco; Allied; and the builder of the tower, Stainless, Inc. ("Stainless"). BOC alleged that the collapse was caused by the negligence of persons for whom TNS, Armco, or Allied were responsible; or by design defects for which Stainless was responsible. The case was removed to federal court on the basis of diversity jurisdiction in June 1997. KNOE intervened to recover damages and expenses not covered by the BOC policy. The State of Louisiana also intervened to assert a claim on behalf of LPB.

On July 19, 1999, Armco and Allied filed a cross-claim against TNS, Nautilus, and General Star, seeking indemnity and/or contribution. General Star filed a cross-claim against Armco and Allied for indemnity and/or contribution and filed a third-party complaint against their insurer, National Union Fire Ins. Co. ("National Union").

A number of motions for partial summary judgment and motions *in limine* were filed, and all claims except those by BOC against General Star were resolved or dismissed before trial. At trial, the jury rendered a verdict in favor of BOC and against General Star, and the court entered judgment in favor of BOC and against General Star in the amount of $4,432,624 plus pre- and post-judgment interest.

4

General Star appeals from several district court rulings on motions for partial summary judgment and motions *in limine*. BOC cross-appeals with respect to calculation of damages and interest.

DISCUSSION

## I.  **The care, custody, or control exclusion**

In March, 2000, General Star moved for partial summary judgment in its favor on the grounds that the "care, custody, or control" exclusion in its policy excluded coverage for the damages sought by BOC. The district court denied General Star's motion and rendered summary judgment against General Star and in favor of BOC, Armco, TNS, KNOE, and the State of Louisiana on this issue.

We review the district court's summary judgment decision *de novo*, applying the same standard on appeal that is applied by the district court. *See Pratt v. City of Houston, Texas*, 247 F.3d 601, 605-606 (5th Cir. 2001). Summary judgment may be granted if there is no genuine issue as to material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56 (c). In determining whether summary judgment is appropriate, the courts should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion and all reasonable doubts about the facts should be resolved in favor of the nonmoving litigant. *See Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982).

5

The General Star insurance policy contains a "care, custody or control exclusion," which provides:

> "This policy does not apply to property damage:
> ...
> (c)... property in the care, custody, or control of the Insured or property over which the Insured for any purpose is exercising physical control."

The parties agree that Louisiana law applies to the interpretation of the exclusion. We apply Louisiana state law as interpreted by the Louisiana Supreme Court; if that court has not definitively ruled on a particular issue, we must predict how it would decide the issue. *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 n.3 (5th Cir. 2001).

We find that the "care, custody, or control" exclusion does not apply in this case. Under Louisiana law, insurance policies are contracts, and the parties' intent as reflected by the language of the policy determines the extent of coverage. *Reynolds v. Select Props., Ltd.*, 634 So.2d 1180, 1183 (La. 1994). Under General Star's interpretation of the exclusion, TNS would lose virtually all liability insurance coverage. TNS is in the sole business of inspecting, maintaining, and repairing towers. So to interpret the exclusion as applying whenever TNS works on a tower "would be an anomalous result." *Aladdin Oil Co. v. Rayburn Well Svcs., Inc.,* 202 So.2d 477, 490 (La. App. 4th Cir. 1967). "If this was intended, the insurer should have indicated more specifically

6

its intent[.]" *Id.* (holding that the "care, custody or control" exclusion did not apply to damages to an oil well where the insured was working only on a short string of tubing in the well, because the insured was in the business of reworking oil wells).

In any case, TNS did not exercise "care, custody, or control" over the tower because the tower was only incidental to the specific sections on which repairs were made. "[D]amaged property or premises merely incidental or adjacent to the contracted object upon which work is being performed by the insured is not within the 'care, custody or control' of the insured for purposes of the exclusion clause in question, even though he might be permitted access thereto during the performance of the contract." *See Thomas W. Hooley & Sons v. Zurich General Acc. & Liability Ins. Co.*, 103 So.2d 449, 450-51 (La. 1958).[1]

---

[1]Another factor that indicates lack of control is TNS's sharing of access to the tower with KNOE. *See Borden, Inc v. Howard Trucking Co., Inc.*, 454 So.2d 1081 (La.1983) (holding that compressor was in the care, custody, or control of the insured, where insured was transporting compressor in truck, thus having exclusive access to it); *Hendrix Elec. Co., Inc. v. Casualty Reciprocal Exchange*, 297 So.2d 470, 475 (La. App. 2d Cir. 1974) (holding that an insured who was installing a circuit breaker on a panel where other circuit breakers had already been installed did not have care, custody, or control of the other circuit breakers or the box in which they were contained, as he had only temporary access and limited possession of the circuit breaker box, but he did have control of the panel because he was "charged by the contract and as an essential element of the work to work directly on and with the panel.").

Because TNS did not have care, custody or control of the tower within the meaning of the exclusion in General Star's policy, we affirm the district court's grant of summary judgment on this issue.

## II. **Vicarious liability of Allied**

On cross-motions for summary judgment filed by TNS, Nautilus, and General Star on one hand, and Armco, Allied and National Union on the other, the district court granted summary judgment for the latter group, finding that Allied was not vicariously liable for the negligence of the work crew. We review this issue *de novo*, applying the same standard for summary judgment as did the district court.

In January 1995, TNS and Armco entered a "Client Services Agreement" ("CSA") according to which Armco would "lease [its] employees" to TNS in exchange for a one-time set-up fee for each leased employee, and a percentage of the employees' wages every month. One of the employees would be designated as a "supervising employee" and would be charged with implementing Armco's policies and procedures at the workplace. TNS was required to provide commercial general liability insurance. The CSA was later assigned to Allied, which performed instead of Armco.

The record indicates that the CSA was entered for the purpose of relieving TNS of the administrative burdens involved in taking care of its employees. Ordinarily, Allied's clients (including

8

TNS) would recruit, find, evaluate, and hire the employees; they would then decide whether to have the person be a leased employee and if so, they would send the paperwork to Allied, who would deal with group health, workers' compensation, payroll, and other administrative matters. Allied retained the right to refuse employment, but employment would only be refused in narrow circumstances, such as a positive drug test or lack of proper immigration forms. Allied did not have the right to fire employees, and if an issue arose as to firing, TNS would be consulted and asked to fire the person.

The central question with regard to Allied's liability is whether the work crew consisted of "borrowed employees" for whom Allied is not responsible. General Star contends that the "borrowed employee" doctrine no longer exists in Louisiana, that Allied and TNS were "dual employers," and consequently that Allied should be held vicariously liable, along with TNS, for the negligence of the tower crew. We find that the borrowed employee doctrine is still alive, and that it applies in this case.

Under the borrowed employee doctrine, a general employer may be relieved of vicarious liability for an employee's negligent actions if the employee was "borrowed"; i.e., if at the time of the negligent action the employee was under the control of a specific employer, or was engaged in the specific employer's business. *Benoit v. Hunt Tool Co.*, 53 So.2d 137, 140 (La. 1951). This

9

doctrine has been modified somewhat by the dual employer doctrine, according to which both the special and general employer may be found jointly liable for the torts of a borrowed employee, in circumstances where the employee's negligent acts were "done in the pursuance of duties designated for him by his [general] employer, in whose pay he continued and who had the sole right to discharge him." *LeJeune v. Allstate Ins. Co.*, 365 So.2d 471, 481 (La. 1978). In addition, "where a general employer is engaged in the business of hiring out its employees under the supervision of another employer, the general employer remains liable for the torts of the 'borrowed' employees." *Morgan v. ABC Manufacturer*, 710 So.2d 1077 (La. 1998). Thus, in *Morgan* the Louisiana Supreme Court held that a temporary services agency, which had the exclusive power to recruit, hire, and fire employees and handled administrative duties related to the employees for a specific employer, was a dual employer and was vicariously liable for the employees' torts. *Id.* at 1084. Neither *LeJeune* nor *Morgan* abrogated the borrowed employee doctrine; they simply limited its scope so that it would not apply in cases where the general employer retains control over the employee at the time of the negligent action, such that it can be characterized as a dual employer.

Viewing all facts in the light most favorable to General Star, the work crew was under TNS's control at the time of the negligent action. Thus, even if Allied is considered to be a general

10

employer of the work crew, the borrowed employee doctrine applies. The dual employer doctrine does not apply because Allied's function was primarily that of dealing with paperwork related to the employees. Given that Allied was not in the business of providing tower repair services to companies, it cannot be said that, as in *Benoit*, the work crew was performing the business of Allied. And since the work crew was acting under the direct supervision of TNS, and Allied did not have hiring or firing power, it cannot be said that the work crew was under Allied's control. Allied is easily distinguished from the temporary services agency in *Morgan* in that Allied is not in the business of loaning employees. Thus, we affirm the district court's grant of summary judgment to Armco, Allied, and National Union on this point.

## III. Indemnification of Armco, Allied and National Union

The district court granted a motion for summary judgment in favor of Armco, Allied, and National Union, requiring TNS and its insurers to defend and indemnify the first three for claims arising out of the negligence of the tower crew, in accordance with indemnity provisions of the CSA. The district court also dismissed General Star's cross-claim for contribution and/or indemnity. General Star appeals both decisions.

As discussed previously, we review summary judgment *de novo*, applying the same standard of review as the district court.

11

The CSA contained indemnity provisions requiring that TNS indemnify Armco for "TNS's acts, errors or omissions, including negligent acts and statutory violations," and requiring that Armco indemnify TNS for its acts, errors, or omissions. General Star argues that because Armco and Allied contractually had significant control over the work crew, the collapse of the tower was their fault. Thus, General Star argues, this court should apply the Texas[2] "express negligence" doctrine, which establishes that indemnification for one's own fault must be expressly declared in the contract. *See Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705 (Tex. 1987). Under that doctrine, and assuming that Armco/Allied was at fault, TNS was not obligated to indemnify Armco/Allied.

Because we find that Armco and Allied were not vicariously liable for the work crew's actions, in accordance with the "borrowed employee" doctrine, the fault for the work crew's acts rests with TNS. The "express negligence" doctrine does not apply in this context. Thus, under the CSA, TNS was required to indemnify Armco/Allied. We affirm the district court's grant of summary judgment in this respect.

We also affirm the district court's grant of summary judgment in favor of National Union. Although National Union is not covered by the indemnity provision in the CSA, National Union is entitled

---

[2]The CSA provides that it is governed by Texas law.

12

to implied indemnity from TNS and its insurers. *See Nassif v. Sunrise Homes, Inc.*, 739 So.2d 183, 185 (La. 1999) ("An implied contract of indemnity arises only where the liability of the person seeking indemnification is solely constructive or derivative and only against one who, because of his act, has caused such constructive liability to be imposed.").

IV. **The National Union policy**

General Star argues on appeal that National Union should have been found liable for a proportionate share of the damages awarded to BOC, because the National Union policy covered employees of Allied as long as they were acting within their duties.

General Star did not adequately raise this issue before the district court. While it filed a third-party demand against National Union demanding contribution or additional coverage for the tower crew, General Star did not substantiate this demand; for example, the National Union insurance policy was not even part of the record before the district court. General Star also failed to move for summary judgment on this issue, and did not object to the district court's failure to decide the issue prior to trial. Ordinarily, this Court will not review claims raised for the first time on appeal. *Vogel v. Veneman*, 276 F.3d 729, 733 (5th Cir. 2002). There is no basis for an exception in this case, as the record below was not adequately developed on this issue. *See FDIC v. Lee*, 130 F.3d 1139 (5th Cir. 1997). Thus, we decline to

13

consider General Star's argument that the National Union policy provided coverage for the tower crew's negligence.

## V.  Restoration cost

In May 2000, the district court granted BOC's motion *in limine* to limit the evidence presented at trial to the evidence regarding the replacement cost of the new tower, with no deduction for depreciation.  In November 2000, the district court also ruled that all evidence relating to the pre-collapse condition of the tower was excluded as it was irrelevant, and even if it were relevant, the probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues before the jury. General Star appeals both rulings.

On appeal, this Court reviews the ruling regarding the proper measure of damages *de novo*.  *See Salve Regina College v. Russell*, 499 U.S. 225, 231,  111 S.Ct. 1217, 1221 (1991) (holding that a district court's determinations of state law are reviewed *de novo* on appeal); *Sykes v. Columbia & Greenville Railway*, 117 F.3d 287, 289 (5th Cir. 1997).  The district court's decision to exclude the evidence for lack of relevance is reviewed for abuse of discretion. *Wright v. Hartford Accident & Indemnity Company*, 580 F.2d 809, 810 (5th Cir. 1978).

"When property is damaged through the legal fault of another, the primary objective is to restore the property as nearly as

14

possible to the state it was in immediately preceding the damage." *Coleman v. Victor*, 326 So.2d 344, 346 (La. 1976). Thus, ordinarily "courts have considered the cost of restoration as the proper measure of damage where the thing damaged can be adequately repaired." *Id.* at 346-47 (citation omitted).

In *Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Svc. Co.*, 618 So.2d 874 (La. 1993), the Louisiana Supreme Court reversed a lower court's determination that in a tort case where the cost of restoration exceeded the market value of the damaged property prior to damage, the proper measure of damages was the cost of replacement minus depreciation. Instead, the Louisiana Supreme Court held:

> "[A]s a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred.... If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm."

*Id.* at 879.

In another opinion, the Louisiana Supreme Court also noted that "[t]he general rule of damages cited by courts for valuation of tortiously damaged property without market value is the actual

15

or intrinsic value of the property to the owner." *Emerson v. Empire Fire & Marine Ins. Co.*, 393 So.2d 691, 693 (La. 1981).

In the present case, restoration was not economically wasteful and its cost was not disproportionate to the value of the tower, which was an essential piece of equipment for broadcasting. As noted by BOC, KNOE needed to use the Riverton tower to transmit its signal to its entire broadcasting area. Indeed, precisely because the tower was essential for KNOE to carry on its business, and because of the absence of a market in transmission towers, the intrinsic value of the tower approximates the cost of restoration rather than the market value of the tower. Finally, the tower was, in fact, repaired. *See Roman Catholic Church*, 618 So.2d at 880 ("[T]he plaintiff in the present case is clearly entitled to recover the full cost of restoration because it has, in fact, made the repairs by replacing the building in its original condition.")

General Star argues that depreciation should be considered because more than half the tower's useful life had been expended at the time of the collapse. Thus, General Star argues that under *BellSouth Telecomms., Inc. v. Citizens Utils. Co.*, 962 F.Supp. 79 (E.D.La. 1996), depreciation should be considered. However, the property at issue in *BellSouth* consisted of telephone cables that had a useful life expectancy of four to five years, and which had been cut after two years. After the incident, the plaintiff replaced the cables with new equipment that had a significantly

16

longer life span and greater capacity. In that context, depreciation had to be considered because otherwise the plaintiff would get a substantial windfall. *Id.* at 81. *See also Roman Catholic Church*, 618 So.2d at 880 ("[a]n award of full restoration costs might be inequitable in a case where the damaged part was scheduled for early replacement."). In the present case, the record indicates that the tower's life span was approximately fifty to seventy-five years. Given that the tower had such a long life span, the fact that over half the span had been expended is not as supportive of a claim that the plaintiff benefitted from the tower's collapse: unlike the plaintiff in *BellSouth*, KNOE would not have been forced to replace the tower in the next two years.

But General Star argues that in the next few years KNOE would probably be required to switch to a digital, from an analog, signal. Because the old tower could not accommodate the necessary equipment for the switch, General Star argues that KNOE would have had to build a new tower or modify the old one before 2006, the date that Congress has set for all television stations to switch from analog to digital signals. *See* 47 U.S.C. §309(j)(14)(A). However, the record indicates that KNOE was contemplating the use of its smaller transmission tower in Monroe, Louisiana, rather than the larger Riverton tower, to comply with the requirements of digital transmission in the short term. And the fact that repairs were being made to the tower shows that the tower was probably not

17

scheduled for replacement shortly thereafter.  Moreover, the 2006 deadline for the switch to digital television is not set in stone. Congress has provided that the FCC must extend the date for switching to digital television in several circumstances.  *See* 47 U.S.C. §309(j)(14)(B).[3]  Consequently, the possibility that KNOE would have switched to a digital signal in the next few years is insufficient to support a deduction for depreciation.

In conclusion, we find that the district court did not err in finding that the proper measure of damages was restoration cost, without considering depreciation.  As a result, evidence of the pre-collapse condition of the tower was irrelevant to the calculation of damages, and the district court did not abuse its discretion in excluding the evidence.

VI.  **The exclusion of evidence of LPB's lease payments**

General Star appeals from a district court ruling that evidence regarding LPB's post-collapse lease payments to KNOE was

---

[3]Of particular relevance here is the requirement that the FCC must extend the date in any market in which 15 percent or more of the television households in the market do not have a television receiver capable of receiving digital signals or digital-to-analog converter technology, and do not subscribe to a multichannel video programming distributor that carries one of the digital television service programming channels of each of the stations broadcasting such a channel in that market. *See* 47 U.S.C. §309(j)(14)(B)(iii).  Because of the lack of certainty as to whether digital television will reach market penetration of 85% in KNOE's market, it cannot be said that KNOE would necessarily have to switch to a digital signal by 2006.

18

inadmissible. According to General Star, such payments constituted relevant evidence of mitigation of BOC's damages.

We affirm the district court's ruling. Although the payments may have mitigated KNOE's uninsured loss, they do not reduce BOC's recovery against General Star, given that BOC's payments to KNOE applied only to its insured losses. In effect, although the BOC policy provided a limited amount of coverage for losses incurred due to the suspension of business operations as a direct result of the collapse of the tower, it did not cover KNOE's permanent business losses. And it was the latter set of losses that was mitigated through renegotiation of the lease to LPB. BOC did not benefit from the LPB payments and was not entitled to do so. Thus, the LPB lease payments were not relevant to the assessment of BOC's damages and were properly excluded.

## VII. The salvage proceeds

BOC appeals a district court ruling that General Star was entitled to have $118,918.00 deducted from the jury verdict. That amount reflected the value of the salvage proceeds that KNOE was able to obtain after the collapse of the tower. We affirm the district court's ruling. BOC's insurance policy issued to KNOE provided that "[a]ny recovery or salvage on a 'loss' will accrue entirely to [BOC's] benefit until the sum paid by us has been made up." Thus, BOC was entitled to collect that amount from KNOE; its

19

failure to collect salvage proceeds should not be made up for by General Star.

BOC argues that the district court erred because General Star had been credited with the value of the salvage proceeds twice before. First, BOC contends that the salvage proceeds were considered in the settlement of KNOE's uninsured claim against Nautilus, so BOC did not benefit from the salvage proceeds. This argument is insubstantial: the fact that the salvage proceeds may have been considered in KNOE's settlement with Nautilus does not mean that General Star received a credit for them, and the fact that BOC did not receive the benefit of the salvage proceeds is simply the result of BOC's failure to deduct the value of salvaged items from its payment to KNOE.

Second, BOC argues that General Star was already credited for the salvage proceeds by the jury. As a general rule, this Court does not question jury verdicts, but it will do so in limited circumstances, such as where the verdict appears to be the result of a juror compromise. *See Yarbrough v. Sturm, Ruger & Co.,* 964 F.2d 376, 380 (5th Cir. 1992) ("[W]e do not favor questioning verdicts."); *Thezan v. Mar. Overseas Corp.*, 708 F.2d 175, 180 (5th Cir. 1983) ("It is a cardinal principal [sic] of jurisprudence that we are not allowed to speculate as to the thought processes of the jury."). In the present case, there is no allegation of juror misconduct or of a compromise verdict that would justify

20

speculation about the basis for the verdict. This is particularly true where the district court, which is more familiar with the circumstances of the trial, did not find that the jury had already reduced BOC's award by the value of the salvaged items.

We affirm the district court's deduction of the value of salvage items from BOC's award.

## VIII. Compounding Interest

In its final judgment, the district court ordered that judgment be entered in favor of BOC and against General Star "in the amount of $4,432,624.00 with pre-judgment interest from the date of judicial demand, May 23, 1997, as set forth in La. R.S. 13:4202 and 13:4203, and post-judgment interest as set forth in 28 U.S.C. 1961, together with all costs of these proceedings." BOC appeals, arguing that the district court erred in failing to compound the state pre-judgment interest by the federal post-judgment interest.

Under 28 U.S.C. § 1961(a), in diversity cases, post-judgment interest is calculated at the federal rate, while pre-judgment interest is calculated under state law. *See Nissho-Iwai Co. v. Occidental Crude Sales,* 848 F.2d 613 (5th Cir. 1988). Applying this provision, this circuit has required that post-judgment interest at the federal rate be assessed against the pre-judgment interest. *See Fuchs v. Lifetime Doors, Inc.*, 939 F.2d 1275, 1280 (5th Cir. 1991). To the extent that the district court failed to

21

compound the pre-judgment interest by the post-judgment interest, it erred, and is directed to correct the error by compounding the interest.

## CONCLUSION

The district court's rulings on summary judgment and motions *in limine* are AFFIRMED, with directions that the state pre-judgment interest be compounded by the federal post-judgment interest.