United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 9, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 03-20577
_____

JOHN H BRYAN

                                    Plaintiff-Appellant,

versus

MCKINSEY & COMPANY, INC,

                                    Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before BARKSDALE, EMILIO M. GARZA, and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

    John Bryan brought this employment discrimination suit under 42 U.S.C. § 1981 and § 1988 alleging disparate treatment based on race in violation of the Civil Rights Act. Defendant McKinsey & Co. ("McKinsey") moved for summary judgment. Without an opinion, the district court entered a final judgment in favor of McKinsey. Bryan appeals that ruling. Bryan failed to present evidence either establishing a prima facie case of discrimination or establishing that McKinsey's legitimate explanation for terminating Bryan's employment was a pretext for racial discrimination. Accordingly, we AFFIRM.

Bryan is a black male. He completed his undergraduate education at Stanford University and also graduated from that university's business school. McKinsey hired Bryan in July 1996 to an entry level "associates" position. Bryan was promoted multiple times by McKinsey to positions involving higher levels of responsibility and pay. In 1999, Bryan was promoted to "engagement manager," and in 2000 he was elected by the McKinsey partnership to "associate principal." In 2001, McKinsey terminated Bryan's employment.

McKinsey is a elite world-wide management consulting firm. McKinsey has an "up or out" advancement system. Thus, an employee is either promoted or is terminated. Most employees are eventually terminated. The first two levels of promotion do not involve a vote of the partners. However, starting with promotion to the associate principal ("AP") position further advancement requires election by the partnership. Promotions at this level are based on the firm's "Five-Part Leadership Model." Each AP is evaluated twice a year and is assigned a development group leader ("DGL"). The DGL is the person primarily responsible for assessing the progress of a particular AP and determining whether the AP is prepared to advance to a higher position in the firm. The DGL reports back to the partnership about the progress of the AP. However, the partnership makes the final decision regarding the employment status of the AP with the firm.

In December 2000, five months after he was elected to AP, Bryan was given his first performance review. Although Bryan was based out of McKinsey's now defunct Austin office, Bryan was supervised and evaluated by a partner in McKinsey's Houston office. Joe Avila was assigned to be Bryan's DGL and authored Bryan's evaluation. Although undeniably positive, Bryan's evaluation highlighted some trouble points, specifically regarding client development. Bryan testified

in his deposition that he understood that this concern related to whether he would bring in enough new clients to generate a sufficient amount of work to justify his position and further promotion.

In the time between this evaluation and termination of his employment Bryan's client situation worsened rather than improved. Bryan generated no new business. Rather, one of his two existing clients asked for him to no longer work on its projects. Bryan went through a two month period where he did almost no client work. Further, in that time period, he was warned by a partner in the Austin office, Arshad Martin, that he needed to generate more client work. Bryan also met with Suzanne Nimocks, Office Manager of McKinsey's Houston office, regarding his client development. She provided him with advice concerning this subject and made efforts to have other McKinsey partners advise Bryan as to ways of developing more clients and work.

In April 2001, the Houston partners held a meeting and evaluated Bryan's progress. Both Bryan's DGL, Joe Avila, and Arshad Martin attended the meeting. The partners expressed concern with Bryan's performance since his December 2000 evaluation including his lack of client development, his poor performance for his existing clients, and his lack of time spent in the office. The partners decided that Bryan was no longer performing up to their standards and that he had put himself in a place where it would be difficult for him to meet their expectations. Based on these concerns, they decided to terminate his employment. Subsequently, without further written review or written explanation for his termination, Bryan was asked to leave the firm. He was told that he had lost the trust of the partnership and that the two were better off parting ways.

Bryan brought this employment discrimination suit alleging disparate treatment based on race. After discovery, McKinsey moved for summary judgment. The district court granted the motion and

3

entered judgment in McKinsey's favor without an opinion.  Bryan now appeals.

## II

We review the grant of summary judgment *de novo*, applying the same standard as the district court.  *Boston Old Colony Ins. Co. v. Tiner Assocs., Inc.*, 288 F.3d 222, 227 (5th Cir. 2002).  Summary judgment may be granted if there is no genuine issue as to material fact and the moving party is entitled to a judgment as a matter of law.  *Id.*  In determining whether summary judgment is appropriate, we view the evidence and all factual inferences from that evidence in the light most favorable to the party opposing the motion and all reasonable doubts about the facts are resolved in favor of the nonmoving litigant.  *Id.*

Federal employment discrimination claims based on circumstantial evidence are reviewed under the burden-shifting framework outlined in *McDonnell Douglas Co. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Under that framework "the plaintiff must [first] establish a prima facie case of discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097 (2000).  This burden is one of production and not one of persuasion.  *Id.*  Once the plaintiff has established a prima facie case of discrimination, "[t]he burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.  Once the employer provides sufficient evidence to meet this burden the plaintiff must show that "he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Reeves*, 530 U.S. at 143 (internal quotations omitted).  The plaintiff can meet this evidentiary burden by either providing evidence of intentional discrimination or evidence establishing "the falsity of the employer's explanation." *Id.* at 147; *see Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 574-75 (5th Cir. 2004).

4

Bryan has failed to establish a prima facie case of intentional discrimination. To establish a prima facie case of employment discrimination Bryan must establish that he (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably. *Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001). The parties agree that Bryan is a member of a protected class, was qualified for his position, and was subject to an adverse employment decision. The parties also agree that Bryan was not replaced by someone outside of his class. Bryan, however, contends that he was treated differently than similarly situated counterparts outside of his protected class and was thus subject to disparate treatment. McKinsey contests this assertion.

Bryan contends he was counseled to leave the firm after a shorter tenure at the AP position than his similarly situated non-black counterparts. Bryan relies on data in the record regarding sixteen similarly situated non-black employees from McKinsey's Texas offices from the time period of July 2000, when Bryan was promoted to AP, to January 2002, nine months after his employment was terminated. Of those sixteen employees, six of them had their employment terminated, one moved to a non-partnership role and another voluntarily resigned. Of the eight employees who are still at McKinsey's Texas offices, two of them are Asian and one is Hispanic. Both Asian employees have already been promoted to partner.

Bryan correctly points out that several of the sixteen employees, like Bryan, had negative comments in their evaluations. However, the record only contains evaluations of six of the sixteen APs. Consequently, we do not know whether the other APs similarly had evaluations with negative comments.

5

The record also contains a chart showing the tenures of each of the sixteen employees at the AP level. Based on the information in this chart, Bryan's tenure at the AP position was not the shortest of the employees who were terminated. One of his white peers was fired after less time at the AP level than Bryan. Two others were terminated within two additional months, one of which was the only other AP from the Austin office on this list. A third was terminated within five additional months. Except for Bryan, all the terminated employees are white.

Bryan contends that these white employees were given more time as an AP and given more evaluations before being terminated. Bryan ostensibly contends that the white employees were given more time to improve their stock before they were terminated. Assuming this to be the case, Bryan does not establish disparate treatment as to the adverse employment action. *See Mattern v. Eastman Kodak, Inc.*, 104 F.3d 702, 707 (5th Cir. 1997) (explaining that an adverse employment decision does not include decisions "made by employers that arguably might have some tangential effect upon those ultimate decisions"). Both he and his white counterparts were eventually terminated. Additionally, all sixteen employees were either terminated or promoted at different times within the two year period. This reflects the uniqueness of each employee's situation and McKinsey's practice of continuously evaluating each individual employee based on his progress and potential for progress.

Even if Bryan had established a prima facie case of employment discrimination, he has failed to submit evidence establishing either intentional discrimination by McKinsey or that its proffered explanation for his termination was false. Bryan admits that he has presented no direct evidence that he was fired because of his race. Instead, he contends that racial animus can be inferred from the falsity of McKinsey's explanation for his termination. However, Bryan has not submitted any evidence establishing the falsity of McKinsey's explanation.

6

McKinsey claims that it fired Bryan because of his failure to bring in new business and the dissatisfaction of one of his existing clients with his work. Bryan admits that he knew that McKinsey was concerned with his failure to bring in new clients and that one of his existing clients became dissatisfied with his work. Bryan never specifically contests the truthfulness of McKinsey's contention that these failings drove its decision to terminate his employment. Instead, Bryan relies solely on his allegation that similarly situated white employees were allowed to be an AP for a longer period of time than he was before being terminated to establish that McKinsey's proffered explanation was false. This is not evidence of the falsity of McKinsey's proffered explanation. At best, it is evidence that similarly situated employees were terminated for legitimate reasons at a different time than Bryan was terminated for legitimate reasons. Either way, Bryan was terminated for the legitimate reasons in McKinsey's proffered explanation and Bryan has not established intentional discrimination. *See Valdez v. San Antonio Chamber of Commerce*, 974 F.2d 592, 596 (5th Cir. 1992) (holding that "poor job performance" is a legitimate reason for terminating someone's employment).

Bryan has failed to establish a prima facie case of employment discrimination and has failed to submit any evidence establishing intentional discrimination by McKinsey. Accordingly, the district court's ruling is AFFIRMED.

Both parties requests for attorney's fees are DENIED. *See Dean v. Riser*, 240 F.3d 505, 508 (5th Cir. 2001).

7

CARL E. STEWART, Circuit Judge, dissenting:

I am persuaded that the majority has inappropriately held John H. Bryan ("Bryan") to a higher threshold than a plaintiff is required to meet to establish a prima facie case of employment discrimination sufficient to defeat summary judgment. Bryan has shown sufficient evidence in the record to meet the proper threshold. Accordingly, I respectfully dissent from the majority's affirmance of the district court's grant of summary judgment to McKinsey & Company, Inc. ("McKinsey"), and its dismissal of Bryan's employment discrimination suit.

I agree that, in order to make a prima facie case, a plaintiff must establish that he (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was either replaced by someone outside the protected class, or, that other similarly situated employees outside the protected class were treated more favorably, in other words the plaintiff received disparate treatment. Okoye v. Univ. of Texas Houston Health Sci. Ctr., 245 F.3d 507, 512 (5th Cir. 2001). McKinsey concedes that Bryan has established three of the elements of a prima facie case. It asserts, however, that Bryan has failed to show the fourth element, that he was either replaced by someone outside the protected class or that similarly situated non-protected employees were treated more favorably. Bryan does not contend that he was replaced as an Associate Principal ("AP") by someone outside the protected class. Instead, he asserts that McKinsey employees similarly situated were treated more favorably than he in that they were retained after he was terminated, or if they were fired along with him, it was only after receiving more feedback, guidance and longer tenures.

McKinsey points to the fact that it terminated white APs around the time Bryan was terminated in arguing that Bryan has failed to show disparate treatment between himself and similarly

8

situated white employees. While on its face that may appear to preclude a finding of disparate treatment, the inquiry does not end there. Simply showing that employees of a non-protected class were fired along with the plaintiff will not necessarily result in a finding that no disparate treatment existed. For example, in Vaughn v. Edel, 918 F.2d 517, 522 (5th Cir. 1990), this court held that dispensing less, or outright withholding of, performance feedback to a member of a protected class, while those from the non-protected class received a higher volume of feedback, was evidence of disparate treatment sufficient to establish a prima facie case of discrimination. We stated that by withholding negative feedback from the plaintiff, the employer created a situation where the plaintiff was unaware that her performance had declined to the point where she was vulnerable to be terminated. Id. at 522-23. In creating that unawareness, we found that the employer was not providing the plaintiff the same opportunity that it was providing to its other employees which was the chance to improve her performance and avoid termination. Id.

Bryan contends that similarly situated white McKinsey APs who were retained, and eventually promoted to partner, were given a longer period of time to develop than he was, while those white APs who were terminated along with him were given a greater amount of feedback, guidance, and firm involvement in their career development, as well as longer tenures, prior to their termination. In terms of meeting the threshold of showing a prima facie case sufficient to survive summary judgment, it is not required that Bryan prove disparate treatment, only that he show the existence of evidence on the record that raises a genuine issue of material fact as to whether disparate treatment occurred. Waltman v. International Paper Co., 875 F.2d 468, 477 (5th Cir. 1989).

Bryan's tenure as an AP at McKinsey was approximately ten months, from July 1, 2000 until May 4, 2001. Of the other APs who were also eventually terminated, all of whom were white, only

9

one had a shorter tenure of approximately nine and one-half months. The others had tenures ranging from eleven months to nineteen months. Additionally, other white APs, who were promoted to that position along with Bryan on July 1, 2000, were retained at the firm after he was terminated. Furthermore, McKinsey employee, Suzanne Nimocks, testified that each AP was assigned a designated group leader ("DGL") whose responsibility was, during a twice-a-year AP development meeting held among the principals, to present that DGL's perspectives on the AP to the partnership and develop a message that the partnership would want to send back to the AP. The DGL was to then prepare a feedback memo, and deliver the memo and the feedback to the AP. In addition, the DGL was expected to have periodic conversations with the AP and provide counsel when such was sought by the AP. Nimocks also testified that there were no stringent requirements that an AP bring in clients before making principal, but rather each AP was evaluated based on the five criteria.

At the time he was terminated, Bryan's DGL was Joe Avila ("Avila"). Avila testified that he became Bryan's DGL in late August or early September 2000, and that he prepared Bryan's December 2000, performance feedback. He conceded, however, that he did not recall speaking with Bryan's previous DGL, Jeff Hawn, in regards to Bryan's performance in the preparation of that feedback memo. The record shows that Avila met with Bryan only once in September 2000, for the purpose of telling him what would be required to continue to be a successful member of the firm.[1] Arshad Matin testified that it was normal practice within McKinsey that the DGL have a face-to-face meeting with the AP to discuss performance feedback memos soon after they were prepared. By

---

[1] Avila testified that he met with Bryan on December 8, 2000, in Houston to discuss the December 2000, performance feedback memo. However, Bryan contends that this meeting did not take place because Bryan was traveling from Austin, Texas to Fort Lauderdale, Florida on that date, and provides an American Express travel receipt which supports this contention. Since there is no evidence except for Avila's testimony that such meeting took place, we must assume that Bryan's assertion that no meeting took place is correct.

contrast, Avila did not meet with Bryan to discuss his December 2000 feedback until March 2001, three months after the feedback memo was prepared, and only two weeks before it was decided that Bryan was to be terminated. Bryan's December 2000 performance feedback memo prepared by Avila rated Bryan very positively based on the five criteria that McKinsey focuses on in evaluating an AP's performance. The only negative feedback it contained included recommendations that Bryan bring more focus on the client and practice fronts. It also advised him of complaints from some of his subordinates that at times Bryan's coaching and development of them was inconsistent. The memo concluded by stating that Bryan was viewed as being a high potential consultant.

From December 2000 until April 3, 2001, when it was decided that he was to be terminated, Bryan was not given any written feedback from Avila at all. Avila further testified that he did not recall receiving anything in writing during that period concerning Bryan's performance. Avila testified that he had not given Bryan any written feedback after the termination decision had been made. He testified that the only contact he could recall having with Bryan during this time was when he spoke with Bryan by phone in March 2001, to find out what he was working on.[2] He did not communicate to Bryan that he was on the verge of being terminated. Avila conceded that meetings that had been scheduled between he and Bryan in January, February, and March 2001, for the purpose of discussing Bryan's development and feedback, had been cancelled. Avila acknowledged that he had cancelled some of these meetings. The record also shows that at least two of Bryan's white peers who became AP's on July 1, 2000, received more written feedback than he did. For example, Peers 11 and 12 received written feedback memos in December 2000, May 2001, and June 2001.

_____

[2] Bryan testified that he had a brief meeting in Avila's office in Houston in March 2001, to discuss his December 2000, feedback memo. Again, because Bryan has shown evidence that the December 8, 2000 meeting between he and Avila did not occur, we will assume that this March 2001 meeting did occur.

11

At the summary judgment stage, Bryan is not required to marshal evidence of a quality or quantity such as would convince a jury about the full merits of his claims. All that he is required to show is evidence that creates a genuine issue of material fact that disparate treatment did occur. I am persuaded that Bryan has done so here. When he was terminated, white APs who were promoted to AP at the same time as he were retained. White APs who were promoted at the same time as Bryan but, who were eventually terminated, had longer tenures before being terminated. In terms of feedback, Bryan has shown that white APs received more written feedback. He has also shown that, contrary to the general practice within McKinsey, Bryan received very limited involvement and feedback in his career development from Avila, his DGL. This perspective on the record, at a minimum, shows the existence of a genuine issue of fact that Bryan was treated differently than his white counterparts. For these reasons, I respectfully dissent.