Alfredo GONZALEZ, et al., Plaintiffs,

v.

SMITH INTERNATIONAL, INC., W–H Energy Services, Inc., and Boyd's Bit Service, Inc., Defendant.

Civil Action No. C–08–311.

United States District Court, S.D. Texas, Corpus Christi Division.

Jan. 29, 2010.

624

Robert Eric Reed, Vela Reed PLLC, Filemon B. Vela, Jr., Rhodes Vela LLP, Houston, TX, Joe A. Flores, Attorney at Law, Corpus Christi, TX, Mark J. Levine, Levine & Associates, PC, Bellaire, TX, for Plaintiffs.

Christopher E. Moore, Andrew Phelps Burnside, Christine M. White, Coats and Rose, New Orleans, LA, for Defendant.

### ORDER ADOPTING MEMORANDUM AND RECOMMENDATION

HAYDEN HEAD, Senior District Judge.

On January 7, 2010, a Memorandum and Recommendation was entered, recommending, in part, a finding that Defendants Boyd's Bit Service, Inc., and W–H Energy Services, Inc., fell within the Motor Carrier Act exemption to the Fair Labor Standards Act with regard to the overtime claims of Plaintiffs Robert Garcia and

Juan Moreno. The Magistrate Judge also recommended a finding that W–H Services, Inc., and Boyd's Bit Service, Inc., were joint employers of Plaintiffs Garcia and Moreno.

Plaintiffs Garcia and Moreno have advised the Court that they have no opposition to the Memorandum and Recommendation's proposed disposition of their Fair Labor Standards Act claims.

When no timely objection to the Magistrate Judge's Memorandum and Recommendation is filed, the Court need only satisfy itself that there is no "clear error" on the face of the record in order to accept the Magistrate Judge's recommendation. *See Guillory v. PPG Industries, Inc.*, 434 F.3d 303, 308 (5th Cir.2005) (citing *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1420 (5th Cir.1996)). Having reviewed the pleadings and motions on file, the Court finds no clear error in the Magistrate Judge's recommendation on the Fair Labor Standards Act claims.

Defendants' motion for summary judgment (D.E. 28) is **GRANTED**, and Plaintiff's Motion for Partial Summary Judgment (D.E. 30) is **DENIED.** It is the judgment of this Court that Plaintiffs Garcia and Moreno take nothing against Defendants Boyd's Bit Service, Inc., and W–H Energy Services, Inc., on their claims arising under the Fair Labor Standards Act.

### *MEMORANDUM AND RECOMMENDATION*

B. JANICE ELLINGTON, United States Magistrate Judge.

Plaintiffs Miguel Montemayor, Robert Garcia, Alfredo Gonzalez, Juan Moreno, Ruben Hernandez and Federico "Fred" Pena allege that Smith International, Inc.

("Smith"), W–H Energy Services, Inc. ("W–H Energy"), and Boyd's Bit Service, Inc. ("Boyd's")[1] violated provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. Pending are defendants' motions to dismiss plaintiffs' FLSA claims and discrimination claims under Title VII and 42 U.S.C. § 1981 (D.E. 28, 29) and plaintiffs' motion for partial summary judgment on their FLSA claims (D.E. 30), all filed on November 13, 2009. All parties responded to the pending motions on December 14, 2009 (D.E. 41, 51, 57). Defendants filed a reply to plaintiffs' response to the FLSA claims on December 28, 2009 (D.E. 73).

### JURISDICTION AND VENUE

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper in this court because a substantial part of the actions about which plaintiffs complain occurred in Jim Wells County, Texas, which is located in the Southern District of Texas.

### BACKGROUND

The following recitation of facts is taken from plaintiffs' pleadings and evidence in the record, viewed in the light most favorable to them. Plaintiffs are former employees of Boyd's, which is a subsidiary of W–H Energy. W–H Energy provides products and services used primarily for the drilling, completion and production of oil and natural gas wells through subsidiary companies. Defendant Smith is a Delaware corporation doing business in Texas and it acquired W–H Energy through a merger in August 2008. Boyd's is a Loui-

---

1. Boyd's Bit Service, Inc. is now known as Wireline Control Systems, Inc. Because all the parties still refer to "Boyd's" in the plead-

ings, it will also be referred to as "Boyd's" in this Memorandum and Recommendation.

siana corporation with its principal place of business in Texas and Louisiana.

## A. Juan Moreno

Plaintiff Juan Moreno began working for Boyd's as a shop hand in Edinburg, Texas in November 2005 (Deposition of Juan Moreno, D.E. 54, pp. 17–18, 24). At the time he was hired he was paid $6.00 per hour plus time-and-a-half when he worked more than 40 hours per week (*Id.* at 19, 22). During that time he worked exclusively in the shop and not out in the field (*Id.* at 21).

At some point in 2006 Moreno transferred to the Midland, Texas shop (*Id.* at 24). He continued to work as an hourly employee in Midland until early in 2007 (*Id.* at 29–30). At that time plaintiff began to receive a salary in the amount of $2,800 per month, plus a bonus, rather than an hourly wage. His title was changed to operator and he considered it a promotion (*Id.* at 31, 44). Although he worked in excess of 40 hours per week, he never received overtime pay after he became a salaried employee (*Id.* at 32).

Moreno obtained a commercial driver's license while working in Midland and drove trucks ranging from a Ford F–350 to an 18–wheeler (*Id.* at 33–34, 37). He drove to Hobbs, New Mexico twice in a Ford F–350 "dually" truck to drop off equipment that customers had ordered (*Id.* at 37–39). Moreno used a forklift to load the equipment on the truck and followed safe loading procedures (*Id.* at 40–41). At the job site he would unload and set up the equipment (Moreno Depo., D.E. 55, pp. 56–57).

While Moreno was working in Midland, he lived in the shop with some other employees because he could not afford to rent an apartment on his pay of $6.00 per hour (Moreno Depo., D.E. 70, p. 91). He asked to be put up in a hotel but that did not happen. However, two employees who traveled from Louisiana to Midland were provided decent accommodations (Moreno Depo., D.E. 55, pp. 91, 107).

In the last quarter of 2007 Moreno requested a job transfer. The Edinburg office had closed in the interim and the closest office to Moreno's home was in Alice, Texas. He transferred to the Alice office early in 2008. Moreno's salary did not change from the $2,800 per month which he had been making in Midland, although he did not receive job bonuses for the first month because the manager of the Alice shop told Moreno he was unsure about the quality of his work (*Id.* at 62–63, 67). After a short while Moreno began to work jobs on his own again. He continued to drive 18–wheelers and smaller trucks while he worked in Alice (*Id.* at 63–64). On one occasion Moreno drove to Louisiana with a co-worker to retrieve another truck carrying equipment and then drove the truck back to Texas (*Id.* at 65–66).

At the Alice shop, the manager, Joe Hall, would make jokes using words like "Mexican," "beaners," and "wetbacks," and "niggers." He would say things like "We would have more work if you guys would go back." (Moreno Depo., D.E. 70, p. 135, 160). He often used profanity, talking about "fucking Mexicans" and making jokes. People would laugh at the jokes, although Moreno would not (*Id.* at 160–161).

Moreno terminated his employment with Boyd's in July 2008 (Moreno Depo., D.E. 55, p. 67). He began working for a tool rental firm in Edinburg that same month, making a monthly salary of $2,400 (*Id.* at 69).

## B. Robert Garcia

Plaintiff Garcia began working for Boyd's in September 2004 when it acquired his previous employer, referred to as "Prime" in the record (Deposition of

Robert Garcia, D.E. 52, pp. 15, 21, 23). He worked as an operator and his job duties included pressure testing equipment out in the field and working on lubricators, pipes and blowout preventers (*Id.* at 15, 25). At Prime he had made $8.00 per hour (*Id.* at 68). When he began to work for Boyd's he was converted to a salary and he made $2,600 per month (*Id.* at 24–25). Garcia spent about 25 percent of his time hauling equipment to and from the shop and job sites. He spent the remainder of his time doing field work and shop work (*Id.* at 26). At another point, Garcia said he spent 60 percent of his time driving and working in the field and 40 percent of his time working in the shop (*Id.* at 29). When he worked in the shop he spent most of his time working on equipment, tearing down equipment, painting, washing, inspecting and refueling (*Id.* at 30).

Garcia was transferred from Edinburg, Texas to Midland, Texas in November 2006 (*Id.* at 28). He was promised a raise from $2,600 per month to $4,200 per month when he moved to Midland, but did not receive an increase until three and one-half months later, in March 2007. At that time his salary was increased to $3,800 per month (Garcia Depo., D.E. 52, p. 40; D.E. 53, p. 101). In addition, he received bonuses in the amount of $250 to $375 per job (Garcia Depo., D.E. 53, pp. 104–105).

Garcia's job duties included some clerical work and also communicating with customers (Garcia Depo., D.E. 52, p. 53). Plaintiff told fellow employees Fred Pena, Juan Moreno, Fred Gonzalez and Mike Montemayor that he believed he should be paid overtime (Garcia Depo., D.E. 53, p. 93). He thought the Boyd's payroll scheme violated the FLSA because he was paid the same amount of money whether he worked 40 hours, 90 hours or 100 hours per week (*Id.* at 94).

Garcia worked 85 to 90 hours per week while he was in Midland (*Id.* at 68). He had obtained a commercial driver's license while working at Prime and continued to use it (Garcia Depo., D.E. 52, p. 14). He kept a driver's log in accordance with DOT regulations (*Id.* at 42). He drove Ford F–350 trucks as well as 18–wheeler trucks while at work (Garcia Depo., D.E. 52, p. 14–15, 42; D.E. 53, p. 80). Garcia never drove outside the state of Texas while he worked in Midland (Garcia Depo., D.E. 52 p. 43).

Every time Garcia would have to go to Boyd's shop in Alice where Joe Hall and Lloyd Green were in charge, Hall commented about "fucking Mexicans" taking his equipment to do jobs (Garcia Depo., D.E. 69, pp. 117–118). Garcia heard Hall make the comments countless times (*Id.* at 119). He also heard Green chastising a painter at the Alice shop by calling him a "stupid wetback." Green also called Garcia a "fucking wetback." (*Id.* at 120). While plaintiff was working in Midland, another Boyd's employee, Jim Mathews, also referred to plaintiff and some of his co-workers as "wetbacks." (*Id.* at 123–124).

On another occasion, Garcia commented to Bennie Saintes that he (Garcia) was assistant manager of the Midland shop. Saintes replied that Garcia was not the assistant manager and would never be made assistant manager because he was Mexican (*Id.* at 131). Garcia complained to Harry Jones about the comments made by Joe Hall and Lloyd Green, but did not know if any action was taken in response to the complaints (*Id.* at 134).

Garcia worked for Boyd's in its Victoria, Texas office from January 2008 until he terminated his employment with Boyd's on March 27, 2008 because "of the way they were making differences among employees" and because he thought it was time to move back home (Garcia Depo., D.E. 52, p. 94). He had another job lined up at the

time he left (*Id.* at 97). One of the reasons plaintiff resigned was because he was not allowed to drive the company truck to his apartment, which was about four miles from the shop, but another employee, Beau Oliver, who was not Hispanic, was allowed to drive a company truck to his home in Hallettsville, which was much farther away (Garcia Depo., D.E. 69, p. 149). Finally, Garcia asked for a small raise and it was refused and he decided that Boyd's no longer wanted him as an employee (*Id.* at 150).

## C. Federico "Fred" Pena

Plaintiff Fred Pena started working for Boyd's when it bought out his former employer, "Prime," in September 2004 (Deposition of Fred Pena, D.E. 29–4, p. 26). He continued to work as an assistant manager in the Edinburg shop and was named manager of the shop in April or May 2005 (*Id.* at 26–27). He transferred to the Midland shop in August 2006 and worked as the manager there (*Id.* at 29).

In December 2007 Pena was told that he was being demoted to the position of assistant manager and that John Bageant was going to be the new manager of the shop. Pena was told by Burly Gibson that he had not been properly trained as manager but with Bageant's help he would probably be in a manager position in Alice (*Id.* at 30). At one point, Bageant lost a customer for Boyd's because he was needed on a job site but he arrived three hours late and left in a hurry to attend a fishing tournament (Pena Depo., D.E. 67, pp. 123–124).

When Pena worked in Midland, he was not given a per diem for food and accommodations were not provided. But when Bageant transferred to Midland, he received a much higher salary than Pena, had living quarters provided by Boyd's and received a per diem for food (*Id.* at 108). Pena stayed in the shop because he could not afford to live anywhere else (*Id.* at 109–110).

Pena subsequently requested and was granted a transfer to the Alice shop in April 2008, but terminated his employment after two days because he was put to work washing and painting (*Id.* at 30, 70).

During the time he worked for Boyd's, Pena was called "dirty Mexican," "stupid ignorant Mexican" and "beaner," among other things. Joe Hall would say things such as "Stupid Mexicans, what are you-all doing here? I don't know why they have you-all running the shop when you don't know what you are doing. You all belong in Mexico. Beaners. I am going to go get you a taco of beans and send you on your way to Mexico." (*Id.* at 90). Hall would make the comments both over the phone and in person and regardless of the mood he was in. Pena complained about Hall to Harry Jones, the regional manager (Pena Depo., D.E. 66, p. 92; D.E. 67, p. 94). Pena started asking Moreno to make the calls to Hall for him because he did not want to deal directly with Hall (Pena Depo., D.E. 67, p. 94).

Pena thought Hall had been sent to anger management classes on two or three occasions, but it made the situation worse. When he returned from a training session in Louisiana, his comments became stronger and he said things such as "You stupid mother fucking Mexican. Why the hell did you-all do this to me? What have I ever done to all of the damn Mexicans for me to deserve this? I am sick and tired of you Mexicans trying to make me something that I am not." (*Id.* at 95). Pena wanted to quit but could not afford to do so (*Id.* at 97).

Pena also overheard Jim Mathews making comments to employees in Midland to the effect that the "poor Mexicans" in the Midland office could not afford to buy food. He gave them some cash so they would not

have to eat kitty litter, or cat food (*Id.* at 97–99). Pena also heard Mathews, a salesman, refer to Mike Montemayor, another salesman, as "that short fat Mexican" and saying things like "what you need to do is stop feeding that fucking Mexican food and get him on a diet. He is too damn fat. He is an ignorant Mexican. He thinks he knows a lot of people but I am the one doing most of the work for him." (*Id.* at 99). Mathews commonly used terms like "ignorant Mexicans" and "stupid Mexicans." (*Id.* at 100).

When Pena resigned in May 2008, his stated reason was that he needed to be closer to his home to take care of his aging father. Although he was tired of the discriminatory treatment he had received at Boyd's, he wanted to leave the door open in case he needed to go back (Pena Depo., D.E. 29–4, p. 169 and attached resignation letter). The last straw leading to his resignation was his assignment to the "wash boy" position in Alice, along with a reduction in pay from $6,000 per month to $5,500 per month. He was having migraine headaches and could not sleep (Pena Depo., D.E. 67, pp. 169–170).

### D. Alfredo Gonzalez

Plaintiff Gonzalez worked as an operator for Boyd's at the Edinburg facility around October 2003 and he also acted as the manager of the Edinburg facility (Deposition of Alfredo Gonzalez, D.E. 71, pp. 32, 35). In addition, he worked as a salesman for Boyd's from October of 2007 until he resigned in February 2008 (*Id.* at 94). Gonzalez called Jim Mathews to report that he was resigning. Mathews asked him if he was following Mike Montemayor to a new position and added "because that dumb fat mother fucker don't know what—dumb Mexican mother fucker don't know what he's doing." (*Id.* at 109).

When Gonzalez would call Hall about a job, Hall would make remarks like "Do you-all know what the fuck you-all are doing down there;" "Anything south of the checkpoint,[2] man, you-all don't know what you-all are doing down there," and refer to "you dumb Mexicans down there." He made the comments every day and Gonzalez stopped wanting to talk to him and would try to talk to the assistant manager instead (*Id.* at 122–124).

At a golf tournament, Gonzalez heard Jim Mathews call Mike Montemayor a "stupid ass fat fucking Mexican." (*Id.* at 130). Gonzalez resigned because of the working environment and because he did not want to work with Hall or Mathews (*Id.* at 131).

### E. Ruben Hernandez

Plaintiff Hernandez started working at Boyd's as a field operator in September 2003 (Deposition of Ruben Hernandez, D.E. 68, p. 27). Hernandez attended safety meetings in the Alice shop with Joe Hall. At his first safety meeting in 2003 Hall blamed everything that went wrong on Mexicans and said they did not "know how to do a damn thing right." Hall made similar comments at every Wednesday safety meeting for the next four-and-a-half years. No one protested at the meetings, but employees discussed it among themselves (*Id.* at 59–60). Hall also made comments about the employees in the Edinburg office, saying things like "We always have to go out there and clean up the mess for these stupid Mexicans who don't know what the fuck they're doing." (*Id.* at 69).

Hernandez complained about Hall to Walter Rouse, Lloyd Green, Rick Davis, Harry Jones and James Young (*Id.* at 64, 75). Rouse reported Hall's comments to higher management. Hernandez believed

**2.** "Checkpoint" refers to one of the border patrol checkpoints in South Texas.

that Hall was sent to some sort of class on anger management (*Id.* at 72–73). When Hernandez complained to Davis that Hall was constantly making racial remarks, Davis responded that he knew about it and it would be discussed (*Id.* at 74). Young told Hernandez the situation would get better and told him not to quit (*Id.* at 75).

Hernandez decided to resign because of the friction between himself and Hall. He tried to sit down with Hall three times but felt like they were unable to talk about anything. Hernandez contemplated leaving for about a year before finally deciding to do so (*Id.* at 94–95).

**F. Miguel "Mike" Montemayor**

Plaintiff Montemayor worked as a salesman for Boyd's from December 15, 2002 until January 2008 and Jim Mathews was his supervisor the entire time (Deposition of Miguel Montemayor, D.E. 60, pp. 30–31, 40). He interacted with district managers all over Texas and Louisiana (*Id.* at 34–35).

Mathews, in front of other people, would routinely tell Montemayor things like "Shut the fuck up, you ignorant wetback motherfucker. I don't pay you to think. I just pay you to go out and sell." (*Id.* at 41). It seemed to Montemayor that Mathew's goal in life was to humiliate and downgrade him in public because he made the comments in front of customers and at company events such as golf tournaments (*Id.* at 41–42, 46–52). Mathews also routinely threatened to fire Montemayor, saying "You fucking Mexican, I'll run your ass off in a fucking heartbeat." (*Id.* at 42).

Mathews would ask Montemayor's customers such things as "How the hell can you-all put up with this dumb, ignorant, fucking Mexican son-of-a-bitch?" and "I can't believe he works for you, this dumb, stupid fucking Mexican son-of-a-bitch." At a golf tournament Montemayor was wearing a ball cap sideways and Mathews said to him, "You dumb, stupid fucking Mexican, you don't need to be wearing your fucking cap like a fucking nigger, you son-of-a-bitch." (Montemayor Depo., D.E. 61, pp. 55–57). Mathews told Charlie Scott, a customer, "Look, I got you a fucking wetback to come fucking help you. He's a stupid, ignorant fucking Mexican and he'll clean your dishes or whatever you need to do out here at the ranch." (*Id.* at 59).

Montemayor spent two or three days per week around Mathews and Mathews consistently said things to him like "Shut the fuck up, you stupid son-of-a-bitch. I told you, don't speak unless I tell you to, you dumb-ass Mexican." Montemayor did not respond because he did not want to lose his job (*Id.* at 66).

At a golf tournament Montemayor was cooking meat and Mathews said to him, in front of many people, "Hurry up with the fucking meat, you stupid-ass fucking Mexican." (*Id.* at 68). At another golf tournament, Montemayor stopped to see a friend and when Mathews saw him he said, in front of other people, "You stupid-ass, mother-fucking Mexican, I told you to stay the fuck away from this fucking golf-tournament. You piece of shit, fucking ignorant son-of-a-bitch." (*Id.* at 70).

Montemayor reported Mathew's comments to Steve Journey, Keith Boyd, Dwayne Boyd, Celeste Boyd and James Young (Montemayor Depo., D.E. 61, p. 62; D.E. 62, pp. 76, 95). He also told Mathews more than one time that he needed to be quiet and Mathews responded, "Don't tell me to fucking shut up, you fucking fat motherfucker." (Montemayor Depo., D.E. 62, pp. 95, 105).

Montemayor also had contact with Joe Hall, who routinely made comments that "fucking Mexicans are all fucked up." (*Id.* at 78–79). At safety meetings Hall would say things like "You stupid, ignorant, fucking wetbacks, fucking Mexicans, you better

listen to what I'm fucking telling you, you son-of-a-bitches." (*Id.* at 81).

In February 2008 Montemayor decided that Mathews had told him "Shut the fuck up, you Mexican" for the last time. He e-mailed his resignation to James Young, Berley Gibson and "the HR lady." (*Id.* at pp. 88–89). Montemayor still occasionally thinks about the offensive conduct and wakes up in a cold sweat (*Id.* at 133).

### G. Causes of Action and Grounds for Summary Judgment

(1) Plaintiffs Garcia and Moreno assert that defendants violated the FLSA when they stopped paying them time-and-a-half when they worked more than 40 hours in a week; (2) Plaintiffs Garcia, Moreno and Pena assert that they were subjected to disparate working conditions when they were transferred to the Midland office but were not given living expenses or a per diem, when similarly situated non-Hispanic employees were provided such benefits; (3) All the plaintiffs assert that they were subjected to a severe and pervasive hostile environment; and (4) All the plaintiffs assert that they were constructively discharged. Plaintiffs bring their discrimination claims pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1962.

In their motion for summary judgment on the FLSA claims, defendants argue that they were exempt from having to pay Garcia and Moreno overtime pursuant to the Motor Carrier Act exemption, 29 U.S.C. § 213(b)(1). Regarding the discrimination claims, defendants argue that plaintiffs have failed to make out a *prima facie* case of employment discrimination and have otherwise failed to show that a genuine issue of fact exists regarding their claims. The parties also disagree on whether defendant Smith is liable on any of the claims.

### APPLICABLE LAW

#### A. Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c). An issue is material if its resolution could affect the outcome of the action. *Daniels v. City of Arlington,* 246 F.3d 500, 502 (5th Cir.), *cert. denied,* 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The Court will not weigh the evidence or evaluate the credibility of witnesses. *Caboni v. General Motors Corp.,* 278 F.3d 448, 451 (5th Cir.2002).

The movant bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the movant demonstrates there is an absence of evidence to support the nonmovant's case, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. To sustain this burden, the nonmovant cannot rest on the mere allegations of the pleadings. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Caboni,* 278 F.3d at 451; Fed.R.Civ.P. 56(e). After the nonmovant has been given an opportunity

to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Caboni,* 278 F.3d at 451.

## B. FLSA Cause of Action

Under the FLSA, employees who work more than 40 hours in a work week are entitled to compensation for employment for excess hours at a rate of not less than one and one-half times the employee's regular rate of pay. 29 U.S.C. § 207(a)(1). There are many exceptions to the "time-and-a-half" provision of the statute, including an exemption for "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). This exemption is known as the Motor Carrier Act exemption.

Pursuant to the relevant sections of 49 U.S.C. § 13501, the Secretary of Transportation has jurisdiction over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier between a place in a state and a place in another state. 49 U.S.C. § 13501(1)(A). The Secretary may prescribe requirements for qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier and qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation. 49 U.S.C. § 31501(b).

The term "motor private carrier" means a person, other than a motor carrier, transporting property by motor vehicle when—

(A) the transportation is as provided in section 13501 of this title;

(B) the person is the owner, lessee, or bailee of the property being transported; and

(C) the property is being transported for sale, lease, rent or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(15).

Defendants argue that under these statutes, Garcia and Moreno were exempt employees under the FLSA and not entitled to time-and-a-half pay when they worked more than 40 hours in a work week, because they were subject to regulation by the Secretary of Transportation. Plaintiffs counter that they do not fall within the exception, because any interstate traveling they did was *de minimis* and did not affect their right to overtime pay under the FLSA.

Defendants submitted an affidavit by James Young, the vice-president of sales and operations at Boyd's who stated that Boyd's has shops in Texas and Louisiana. As part of its operations, Boyd's rents and delivers wireline pressure control equipment to other oilfield service companies or to customers at the customer's well site. When the equipment is no longer needed, Boyd's returns to the drop-off location to pick up the equipment and take it to a Boyd's facility for cleaning, maintenance and storage (Declaration of James Young, D.E. 28–6, para. 5–6). The equipment and tools are transported by 18–wheeler tractor trailers, two-ton dual axle flat bed truck, or Ford F–250's, F–350's, F–450's or F–550's. Some of the vehicles and equipment used at Boyd's weigh in excess of 10,001 pounds (*Id.* at para. 16–18).

If Boyd's needs to buy a piece of equipment from an out-of-state vendor, a Boyd's operator may be called upon to drive across state lines to pick up the equipment and deliver it to a customer's well site. Sometimes the out-of-state vendor will ship a piece of equipment to Boyd's where an operator will then deliver it to the

customer (*Id.* at para. 7). Boyd's operators in Texas sometimes drive equipment to Louisiana for repair, maintenance, or refurbishing, or to deliver a piece of equipment needed in a Louisiana district (*Id.* at para. 8–9). Boyd's provides equipment rental and operation services in Texas, Louisiana, New Mexico, California, Oklahoma, Wyoming, Arkansas, Pennsylvania and other states as opportunities arise (*Id.* at para. 12–13).

Boyd's requires its operators to obtain and maintain a Class A Commercial Driver's License in order to operate an 18–wheeler tractor trailer (*Id.* at para. 19). Plaintiffs Garcia and Moreno were expected to drive trucks loaded with equipment across state lines when asked to do so by Boyd's (*Id.* at para. 8, 9, 14).

During the time he worked at Boyd's, plaintiff Moreno obtained a commercial driver's license and drove out of state on Boyd's business three times. He kept a driver's log in accordance with Department of Transportation ("DOT") regulations and followed DOT regulations for safety-checking the truck. He also loaded the trucks, taking care to distribute the weight evenly. He used a forklift to load equipment onto the truck. (Moreno Depo, D.E. 54, pp. 32, 34, 38–44; D.E. 55, p. 48).

Garcia had a commercial driver's license and kept a driver's log in accordance with DOT regulations. He drove F–350 trucks as well as 18–wheeler trucks. Garcia never drove outside the state of Texas while he worked for Boyd's (Garcia Depo., D.E. 52, pp. 14–15, 30, 42–43; D.E. 53, p. 80).

Both Moreno and Garcia signed documents entitled "Boyd's Interstate DOT Agreement" which stated the following:

Boyd's Rental Tools conducts activities all across the United States and trans-ports our equipment in connection with these activities. Accordingly, Boyd's Rental Tools is a motor carrier governed by the Department of Transportation (DOT).

Agreement:

With the above being stated, I acknowledge that during the course of my normal job duties, I am subject to travel to other states (Interstate) to perform my assigned duties. I also agree to comply with applicable DOT standards.

(Agreements, D.E. 28–3, Ex. 2 to Moreno's Depo.; D.E. 28–4, Ex. 1 to Garcia Depo.).

■ Exemptions to the FLSA overtime regulations are to be narrowly construed and the burden of proof is on the party claiming the exemption. *A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 65 S.Ct. 807, 808, 89 L.Ed. 1095, 1098 (1945); *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393, 396 (1961).

■ Although Moreno traveled out of state only three times and Garcia never did so, it is well-settled that "it is the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the [Secretary's] power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment." *Morris v. McComb,* 332 U.S. 422, 431–432, 68 S.Ct. 131, 135–136, 92 L.Ed. 44 (1947) (internal citations and quotations omitted). When interstate trips are a "natural, integral and apparently inseparable part of the common carrier service [3] of the employer and his drivers," and where, in the normal course of business, interstate commerce trips are "distributed generally throughout the year and their performance [is] shared

---

**3.** Although the *Morris* court involved "common carriers" and the instant case involves a "motor private carrier," the Fifth Circuit applied *Morris* to a motor private carrier in *Kerr v. Jeans,* 193 F.2d 572 (5th Cir.1952).

indiscriminately by the drivers and [is] mingled with the performance of other like driving services," employees are subject to the Motor Carrier Act exemption even where not all drivers drive in interstate commerce. *Id.*, 332 U.S. at 433, 68 S.Ct. at 136. *See also Troutt v. Stavola Brothers, Inc.*, 107 F.3d 1104, 1107 (4th Cir. 1997) (employees need not devote majority of time to safety-affecting activities to be covered by the Motor Carrier Act); *Brennan v. Schwerman Trucking Co.*, 540 F.2d 1200, 1203 (4th Cir.1976) (focus of inquiry is on whether Secretary has power to establish qualification and maximum hours of service for employees); *Starrett v. Bruce*, 391 F.2d 320, 323 (10th Cir.1968) (test is whether Secretary has power to establish qualifications and maximum hours, rather that the conditions or qualifications established in the exercise of that power).

█ In this case, defendants have established that Boyd's is a motor private carrier engaged in interstate commerce and that Moreno and Garcia were subject to being called to drive in interstate commerce when Boyd's needed them to do so. Accordingly, under *Morris* and its progeny, they fall under the Motor Carrier Exception of the FLSA.

Plaintiffs argue that because Moreno made only three interstate trips and Garcia made none, that their interstate driving was *de minimis* and did not exempt them from the FLSA, citing in support *Dole v. Circle "A" Construction, Inc.*, 738 F.Supp. 1313 (D.Idaho 1990); *Kimball v. Goodyear Tire and Rubber Company*, 504 F.Supp. 544 (E.D.Tex.1980) and *Coleman v. Jiffy June Farms, Inc.*, 324 F.Supp. 664

(S.D.Ala.1970). However, in *Circle A,* the court determined the "indiscriminate assignment" of interstate routes described in *Morris* did not apply because the employer had not shown that it indiscriminately assigned interstate routes among all it drivers. *Circle A,* 738 F.Supp. at 1321. That is not the situation here, where Moreno and Garcia acknowledged in writing that they were subject to travel to other states to perform their duties.

In *Kimball* the court noted that interstate driving assignments were not made randomly, but were assigned based on seniority. *Kimball,* 504 F.Supp. at 548. The court also noted that only 10 of 39 drivers made out-of-state trips and that only 0.14% of all the trips were out of the state. *Id.* at 547. No such evidence exists in this case. While it is true that defendants have the burden of showing that the exception applies, they have provided proof in the form of Young's affidavit that Boyd's drivers do engage in interstate commerce and that Moreno and Garcia were subject to being asked to drive out of state as part of their job duties. Plaintiffs have presented nothing to contradict Young's affidavit.

Finally, in *Coleman,* the court contemplated evidence that interstate travel made up only .23% of the employer's business and that each driver would have spent .00343% of his time in interstate commerce. *Coleman,* 324 F.Supp. at 669. There is no such evidence in the record at hand and without it, there is no fact issue regarding whether Boyd's interstate business is *de minimis* for purposes of the Motor Carrier Act.[4]

---

4. Plaintiffs also point out that the Hon. Janis Graham Jack concluded in another case that the Motor Carrier Act exception did not apply to an employee of W–H Energy Services. *See Yaklin v. W–H Energy Services, Inc.*, No C–07–422 (S.D.Tex. Oct. 22, 2008; D.E. 31–4). The *Yaklin* case differs from the instant case in at

least two respects. First, the employee there worked primarily in the shop (*Id.* at p. 2), whereas Moreno and Garcia's job responsibilities clearly included driving equipment to well sites, wherever they might be. Second, the defendant worked for a different subsidiary of W–H Energy, Coil Tubing Services,

Boyd's should be found to fall under the Motor Carrier Act exemption to the FLSA in regard to paying overtime to plaintiff's Garcia and Moreno. Summary judgment should be entered for defendants on this issue.[5]

## C. Discrimination Causes of Action

Plaintiffs bring claims under both Title VII and 42 U.S.C. § 1981. Under Title VII, it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin. 42 U.S.C.A. § 2000e–2.

42 U.S.C. § 1981 provides that all persons in the United States will have the same contractual rights that white citizens have. "Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII." *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448, n. 2 (5th Cir.1996) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989)). Because § 1981 claims are evaluated under the same evidentiary standards as Title VII claims, discussion under both statutes will be combined for plaintiffs' the claims.

### 1. General Analysis

The analysis of a Title VII case is well known:

The plaintiff must establish a prima facie case that the defendant made an employment decision that was motivated by a protected factor. Once established, the defendant bears the burden of producing evidence that its employment decision was based on a legitimate nondiscriminatory reason. The burden then shifts back to the plaintiff to prove that the defendant's proffered reasons were a pretext for discrimination. But, if the defendant has offered a legitimate nondiscriminatory reason for its action, the presumption of discrimination derived from the plaintiff's prima facie case 'simply drops out of the picture,' ... and 'the ultimate question [is] discrimination *vel non.*'

*Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1089–90 (5th Cir.1995) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253–257, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1971)).

 The focus then shifts to the ultimate question of whether the defendant intentionally discriminated against the plaintiff. *Grimes v. Tx. Dept. of Mental Health*, 102 F.3d 137, 140 (5th Cir.1996) (citing *Hicks*, 509 U.S. 502, 510–511, 113 S.Ct. 2742, 2749 (1993)). Title VII plaintiffs must ordinarily prove their claims through circumstantial evidence and may

---

L.L.C., rather than for Boyd's and the companies performed different services. Differences in the two cases suggest a different resolution of the issues.

5. Plaintiffs declined to address defendants' arguments regarding the SAFETEA–LU Technical Corrections Act and its applicability to this case, saying that it was irrelevant in light of their argument that the Motor Carrier Act

exemption did not apply to them. *See* Def's Mo. for Sum. Jmt. D.E. 28, pp. 18–21 and Pl's Resp. to the Mot. for Sum. Jmt., D.E. 51, p. 9. . In the absence of argument by plaintiffs, it will be assumed that defendants' characterization of the legislation is correct and that it applies to this case. Such application does not change the recommendation that judgment be entered for defendants on the FLSA claims.

do so by demonstrating that a defendant's articulated non-discriminatory reason was pretextual. *Grimes,* 102 F.3d at 141 (citations omitted). A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may, but does not necessarily, permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.,* 530 U.S. at 148–149, 120 S.Ct. at 2109.

■ In order to make out a prima facie case, a plaintiff must show that (1) he belongs to a protected class; (2) he was qualified to do his job; (3) despite his qualifications, his employment situation was adversely affected and (4) similarly situated employees outside the protected group were treated more favorably. *Bryan v. McKinsey & Co., Inc.,* 375 F.3d 358 (5th Cir.2004) (citing *Okoye v. Univ. of Texas Houston Health Sci. Ctr.,* 245 F.3d 507, 512 (5th Cir.2001)).

## 2. Hostile Environment

■ To state a claim for hostile environment race discrimination, one must show that one belongs to a protected group, was subject to unwelcome racial harassment, the harassment was based upon race; the harassment affected a term, condition or privilege of employment and the employer knew or should have known of the harassment and failed to take prompt remedial action. *Waltman v. International Paper Co.,* 875 F.2d 468, 477 (5th Cir.1989) (citing

*Jones v. Flagship International,* 793 F.2d 714, 719–720 (5th Cir.1986)).

■ A plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of the complainant's employment and create an abusive working environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *Walker v. Thompson,* 214 F.3d 615, 625 (5th Cir.2000). He need not show that the conduct seriously affected his well-being or led him to suffer injury, but that the environment would reasonably be perceived and is perceived as hostile or abusive. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993) (citing *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405).

■ The court looks at the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. at 371. In the Fifth Circuit, discriminatory verbal intimidation, ridicule and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Walker,* 214 F.3d at 626 (citing *Wallace v. Texas Tech University,* 80 F.3d 1042, 1049 n. 9 (5th Cir.1996)). However, the mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370.

## 3. Constructive Discharge

■ A "constructive discharge" can be an adverse employment action if a plaintiff is able to prove the required elements. *See, generally, McCoy v. City of Shreveport,* 492 F.3d 551 (5th Cir.2007).

" 'A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable person would feel compelled to resign.' " *Id.* at 551 (citing *Hunt v. Rapides Healthcare Sys., LLC,* 277 F.3d 757, 771 (5th Cir.2001)). A constructive discharge claim requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment. *Benningfield v. City of Houston,* 157 F.3d 369, 378 (5th Cir.1998). It is necessary to examine the conditions imposed, not the employer's state of mind, and an employee does not need to prove that an employer subjectively intended to force the employee to resign. *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980); *Hammond v. Katy Indep. Sch. Dist.,* 821 S.W.2d 174, 177 (Tex.App.-Houston [14th Dist.] 1991, no writ).

▮▮▮▮ The Fifth Circuit has stated the following in regard to the elements of a constructive discharge:

> Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not.

*McCoy,* 492 F.3d at 557 (citing *Hunt,* 277 F.3d at 771–772 and *Haley v. Alliance Compressor LLC,* 391 F.3d 644, 650 (5th Cir.2004)). Threats of termination can result in a constructive discharge. *Faruki v. Parsons S.I.P., Inc.,* 123 F.3d 315, 319 (5th Cir.1997). Exposure to a rude, demanding boss does not render employment intolerable so as to support a claim for constructive discharge. *Webb v. Cardiothoracic Surgery Associates,* 139 F.3d 532, 540 (5th Cir.1998).

Defendants in this case argue that the plaintiffs cannot establish prima facie cases of employment discrimination because none of them can establish that they suffered an adverse employment action. Defendants also argue that none of the plaintiffs have established the necessary elements of a hostile environment or constructive discharge cause of action.

#### a. Moreno

Plaintiff Moreno argues that he was paid $6.00 per hour while a non-Hispanic shop hand, Randy Mooring, was paid $10.00 per hour. Moreno also complains that he, along with plaintiffs Garcia and Pena, was not furnished housing and other benefits while other employees, John Bageant and Nathan Rice, were provided such benefits. Finally, Moreno claims that he was required to work 21 days straight, whereas non-Hispanic employees were allowed to drive the company truck to their homes every two weeks.

▮▮▮▮ An employee who proffers a fellow employee as a comparator must demonstrate that the employment actions at issue were taken under nearly identical circumstances. Specifically, a plaintiff must show that the employees being compared held the same job or responsibilities and shared the same supervisor or had their employment status determined by the same person. *Lee v. Kansas City Southern Railway Co.,* 574 F.3d 253, 260 (5th Cir.2009) (citations omitted).

▮▮▮▮ Moreno has failed to make out a prima facie case because he has not shown that he and Mooring were similarly situated. He offered no evidence regarding their relative experience, seniority, job

duties or supervisors. In addition, he offered no evidence at all regarding the non-Hispanic employees whom he alleges were allowed to drive home when he was not. Without offering such evidence, Moreno cannot show that any disparity in pay or working conditions was based on race.

 Regarding the difference in accommodations, Moreno has made out a prima facie case because he presented evidence that he and his Hispanic co-workers, who were unable to afford to rent housing for themselves, lived in the shop while non-Hispanic coworkers were given a housing and food allowance.

In response, defendants offer a legitimate, non-discriminatory reason for the difference in working conditions. James Young, vice president of sales and operations at Boyd's, stated in an affidavit that Moreno, Pena and Garcia were permanently assigned to the Midland location while Bageant and Rice were only sent there temporarily to address problems believed to be caused by poor management (Affidavit of James Young, D.E. 28–6, pp. 4–5). Bageant was a senior operator for Boyd's in Louisiana and Rice was an operator (*Id.* at 4). After Bageant and Rice were in Midland for six to eight weeks, Young decided to make Bageant manager of the shop. Rice stayed in Midland only for a few months and Bageant transferred to another facility before the Midland shop shut down (*Id.* at 5).

Based on the foregoing, defendants gave a legitimate, non-discriminatory reason for not supplying Moreno with housing and a per diem while he worked in Midland. Moreno has presented no evidence to show that the proffered reason for the difference in treatment was a pretext for discrimination. Accordingly, judgment should be entered for defendants on Moreno's claim regarding the pay disparity and the difference in housing and per diem allowances.

 Moreno also claims that he was subjected to a racially hostile environment and constructively discharged. Moreno worked with Hall in the Alice shop from early 2008 until July 2008, where Hall routinely made jokes using words like "Mexican," "beaners," "wetbacks," and "niggers." He would say things like "We would have more work if you guys would go back" and talked about "fucking Mexicans."

In *Walker*, the Fifth Circuit noted that it had assumed in *Wallace* that if there was specific evidence of routinely made racist remarks, then a fact issue had been raised to prevent summary judgment. *Walker*, 214 F.3d at 626 (citing *Wallace*, 80 F.3d at 1049, n. 9). The *Walker* court went on to determine that summary judgment was not appropriate where, for a period of more than three years, black employees were subjected to comparisons to slaves and monkeys, derisive remarks regarding their African heritage, offensive remarks regarding their hair, conversations in which a co-worker and supervisor used the word "nigger," and being told that the vice-president of the company did not want the African–American women to talk to each other. *Walker*, 214 F.3d at 626. *See also Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1266 (7th Cir.1991) (summary judgment precluded where plaintiff presented evidence that he was subjected to "nigger jokes" for ten years and whose work station was adorned with a human-sized dummy with a black head) and *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182 (4th Cir.2001) (summary judgment inappropriate where plaintiff suffered incessant racial slurs, including "nigger" and "dumb monkey").

Moreno presented evidence of routinely made racist remarks and thus has raised a fact issue regarding his hostile environment claim. Accordingly, summary judg-

ment should be denied on this issue and he should be allowed to proceed on this claim.

■ The issue of constructive discharge is a closer one, but Moreno has arguably shown that a fact issue exists. Of the six factors set out in *McCoy*, 492 F.3d at 557, Moreno has described "badgering, harassment or humiliation by the employer calculated to encourage his resignation" when Hall, in addition to his constant racial epithets, told Moreno and others that there would be more work if "they" would go back, implying that the Hispanics should leave the job so there would be more work for non-Hispanics. A jury hearing such testimony might well conclude that a reasonable person would feel compelled to resign. For this reason, summary judgment on this claim is not appropriate and Moreno should be allowed to go forward on his constructive discharge claim.

### b. Garcia

■ Plaintiff Garcia avers that Boyd's discriminated against him when he was told by his supervisor in Victoria that he could not take his company vehicle to his apartment, which was four miles from the shop, while a non-Hispanic employee was allowed to take a company vehicle to his home in Hallettsville, which was approximately 40 miles away. Garcia also claims that when he worked in Midland, he was told to stay at the shop and not to travel to see his family in the Rio Grande Valley, while similarly situated white employees were allowed to drive Boyd's vehicles back and forth from Midland to their homes in Louisiana. As discussed above, Garcia has the burden of showing that he and the

comparators he offers were working under nearly identical circumstances. *Lee*, 574 F.3d at 260. However, he has offered no evidence regarding the proposed comparators' supervisors, seniority, or job duties. Accordingly, he has failed to make out a prima facie case of employment discrimination based on these allegations.

Garcia also claims that he was subjected to disparate treatment when he was not provided housing and a per diem while in Midland. But, like Moreno, Garcia failed to present evidence that defendants' legitimate, non-discriminatory reason for not providing housing and a per diem was a pretext for discrimination. Therefore, his claim fails.

■ Regarding Garcia's hostile environment claims, he also was exposed to Hall's vitriol. He testified that Hall made countless comments about "fucking Mexicans" taking his equipment to do jobs. Garcia also reported hearing Lloyd Green call another employee a "stupid wetback" and Green also called Garcia a "fucking wetback." In Midland, Jim Mathews referred to plaintiff and some of his co-workers as "wetbacks." Garcia has presented evidence sufficient to create a fact issue on whether he was subjected to a hostile environment based on race. *Walker*, 214 F.3d at 626.[6]

■ Garcia does not appear to have stated a claim for constructive discharge. The reasons he mentioned for quitting—that he was not allowed to drive the company truck to his apartment and that defendants refused his request for a raise—did not create intolerable working condi-

---

**6.** Defendants argue that any claim Garcia may have based on a hostile environment is time-barred because he did not file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in a timely manner. Even if this is true regarding his Title VII claim, his hostile environment claim

brought under 42 U.S.C. § 1981 is not time-barred. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–383, 124 S.Ct. 1836, 1845–1846, 158 L.Ed.2d 645 (2004); *Alpha Portland Cement Co. v. Reese*, 507 F.2d 607, 610 (5th Cir.1975).

tions. He did not cite having to work around Hall or Mathews as a reason for resigning. Accordingly, judgment should be entered for defendants on Garcia's constructive discharge claim.

### c. Fred Pena

Plaintiff Pena claims that although he was performing well for Boyd's, he was demoted from his position of manager of the Midland shop to assistant manager and Bageant, a non-Hispanic, was placed in the management position. He claims that Bageant did not perform well in the position and was allowed more time off than had been allowed Pena. When Pena transferred to the Alice shop, he claims he was demoted again, this time to the position of "wash boy." He terminated his employment with Boyd's two days after his transfer to the Alice shop.

■ Pena made out a *prima facie* case of employment discrimination based on his demotion and replacement by Bageant, because he claims that he was qualified for the position but was replaced by a non-Hispanic who received more favorable treatment than Pena had received. However, Young, the vice-president of sales and operations at Boyd's, stated in an affidavit that from the time the Midland shop had opened, it had not been successful, due at least in part to poor management, and that he had heard reports that Pena was hiring temporary workers while he, Garcia and Moreno played cards (Affidavit of James Young, D.E. 29–11, pp. 4–5). In addition, Young stated that it became apparent that the Midland employees were not receptive to following the direction of Bageant. After Bageant and Rice were in Midland for six or seven weeks, Young promoted Bageant to the position of manager of the shop (*Id.* at 5).

Pena did not offer any evidence to show that the explanation given by Young for his demotion was a pretext for discrimina-tion. Although he offered evidence that Bageant acted irresponsibly in the position on one occasion, the incident occurred after the fact of his demotion and is not relevant to the issue of whether he was demoted based on his race. Because he has not presented any evidence of pretext, defendants are entitled to summary judgment on this issue.

■ Nor has Pena made out a race discrimination claim based on the fact that when he voluntarily transferred to the Alice shop, he was put to work washing and painting. He understood that he would have to take a $500 per month pay cut when he moved to Alice, from $6,000 per month to $5,500 per month, but also was told that he would probably be in management (Pena Depo., D.E. 67, pp. 160–161). When he got to Alice, John Maruby told him that he would have to prove himself in the Alice shop by starting at the bottom (*Id.*). After two days of washing and painting, he quit, giving as a reason that he needed to be closer to his father. Based on these facts, plaintiff has failed to make out a prima facie case of employment discrimination. He voluntarily transferred to Alice with the understanding that he was taking a pay cut and has not shown that anyone outside his protected class was treated better than he was once he arrived in Alice. For this reason, summary judgment should be entered for defendants on this issue.

■ Regarding Pena's hostile environment claim, when he worked in Edinburg he would have to talk to Hall by phone three or four times per week and when he was in Midland he would talk to him two or three times per week. Hall would make racist comments, as described above, regardless of whether he was in a good mood or bad mood, but it was worse when he was in a bad mood. Pena reported the comments to Harry Jones, the regional

manager, and he believed Hall was sent to anger management classes, but when Hall returned from one class he called Pena a "stupid mother fucking Mexican" for having reported him. Pena did not want to deal with Hall any longer and started asking Garcia to make the calls for him. He suffered from stress and had severe headaches and rashes.

Pena has presented evidence which, if believed by a jury, would show that he was subjected to a hostile environment based on his race every time he talked to Hall. Conversely, he has not presented evidence to show that he was constructively discharged, which requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment. Even after dealing with Hall for several years, he volunteered for a transfer to the Alice shop which Hall managed and stated that he quit after two days when he was assigned to work as a "wash boy." Plaintiff Pena should be allowed to proceed on his hostile environment claim but judgment should be entered for defendants on his constructive discharge claim.

### d. Alfredo Gonzalez

 Plaintiff Gonzalez brings claims for hostile environment discrimination and constructive discharge. He testified that while he worked in Edinburg from October 2003 through October 2007 he had to make frequent telephone calls to Hall, who would make remarks such as "Anything south of the checkpoint, man, you-all don't know what you-all are doing down there," and refer to "you dumb Mexicans down there." Gonzalez arrived at a point where he no longer wanted to talk to Hall and would try to talk to the assistant manager in Alice instead. Gonzalez has presented evidence sufficient to overcome defendants' motion for summary judgment on the hostile environment claim.

 Gonzalez, who became a salesman for Boyd's in October 2007, also witnessed Mathews calling Montemayor a "stupid ass fat fucking Mexican" at a golf tournament He said he resigned because he did not want to work in that environment or around Hall and Mathews. Given the pervasive nature of Hall's and Mathew's comments, summary judgment would not be appropriate in Gonzalez's circumstances. He should be allowed to proceed on his constructive discharge claim.

### e. Ruben Hernandez

 Plaintiff Hernandez brings a claim for hostile environment discrimination and constructive discharge. Hernandez worked in the field, but attended safety meetings in the Alice shop with Hall. Hall made comments about "stupid Mexicans" at every weekly safety meeting for four-and-a-half years as well as in other contexts. Hernandez tried to talk to Hall about the comments but he never stopped making them. Hernandez complained about Hall to Walter Rouse, Lloyd Green, Rick Davis, Harry Jones and James Young but the situation never changed.

Hernandez testified that after thinking about it for a year, he resigned because of the friction between himself and Hall. Based on his description of events and the relevant case law, Hernandez should be allowed to proceed on both his hostile environment and his constructive discharge claims.

### f. Mike Montemayor

 Montemayor worked as a salesman for Boyd's from December 2002 through January 2008. As described above, during this time period Mathews relentlessly badgered and humiliated Monteymayor, both in private and public, using offensive racial epithets.

Defendants presented evidence that Montemayor referred to Mathews and another salesman, Chip Clinkscales, as "dumb-ass gringos," and "stupid gringos," and called Mathews "Old Man" and "Pops," that he referred to people living in the Rio Grande Valley as "stupid Mexicans" and that everyone made the comments in a joking manner. Clinkscales also said that Montemayor frequently used profanity, racial slurs and engaged in other vulgarity (Declaration of Chip Clinkscales, D.E. 29–14). Montemayor denied making jokes based on race, national origin or gender and denied laughing or engaging in banter with Mathews (Montemayor Depo., D.E. 62, p. 87, 96).

Based on the relevant case law, Montemayor has made out claims for both hostile environment discrimination and constructive discharge. Fact issues exist which preclude summary judgment and defendants' motion for summary judgment on these claims should be denied.

### D. Liability of Smith

Defendant Smith argues that it should be dismissed from the lawsuit because it did not employ any of the plaintiffs and that the only possible basis for its inclusion in the lawsuit is as a successor to plaintiffs' former employer, Boyd's, but that the doctrine of successor liability is not applicable in this case. Plaintiffs counter that Smith is liable as a joint employer. Because plaintiffs are alleging that Smith is liable as a joint employer and not as a successor to Boyd's, only that argument will be addressed.

■■■■■ In discrimination cases, courts construe the term "employer" broadly to include superficially distinct entities that are sufficiently interrelated to constitute a single, integrated enterprise. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 777 (5th Cir.1997) (citations omitted). To determine whether a parent corporation and

its subsidiary may be regarded as a single employer, a four-part test is used. Courts look at (1) the interrelation of operations; (2) centralized control of labor or employment decisions; (3) common management; (3) common ownership or financial control. *Id.* (citations omitted). The analysis ultimately focuses on whether the parent corporation was a final decision-maker in connection with the employment matters underlying the litigation. All four factors are examined only as they bear on the precise issue of discrimination. *Id.* (citations omitted).

■■■■ On August 25, 2008 Smith acquired W–H Energy Services, Inc. At the time of the acquisition, W–H Energy Services, Inc. owned Boyd's. W–H Energy Services, Inc. did not survive the acquisition. A company now known as W–H Energy Services, L.L.C. was created and now owns Boyd's. Smith owns W–H Energy Services, L.L.C. Boyd's remains an operating entity and is now known as Wireline Control Systems, Inc. (Declaration of Pamela L. Kunkemoeller, D.E. 29–15).

Plaintiffs rely on the deposition testimony of Douglas Frankhouser, the director of corporate human resources at W–H Energy Services, to establish that Smith was a joint employer of the plaintiffs (Resp. to Mo. for Sum. Jmt., D.E. 57, pp. 38–40; Deposition of Douglas Frankhouser, D.E. 57–2, p. 49). However, Frankhouser testified that his last employer was W–H Energy Services and that he was only technically employed by Smith and that he "never really worked for Smith." (Frankhouser Depo., D.E. 57–2, p. 15). Frankhouser testified that Keith Boyd handled a majority of the human resource functions at Boyd's, but no one carried the title of human resources manager. When Boyd's wanted to terminate or discipline an employee, they would often call Frankhouser

for input (*Id.* at 38). Frankhouser drafted the employee policy manual for Boyd's, but if Boyd's wanted to make changes, they would discuss them (*Id.* at 46–47). Frankhouser was involved in an internal investigation of Montemayor's claims against Mathews (*Id.* at 64–65).

Nothing in any of Frankhouser's testimony indicates that Smith is a joint employer of the plaintiffs in this case, but only that W–H Energy Services is a joint employer. Accordingly, Smith should be dismissed from this lawsuit.

### RECOMMENDATION

Based on the foregoing, it is respectfully recommended that defendants' motions for summary judgment (D.E. 28, 29) be granted in part and denied in part. It is also recommended that plaintiff's motion for partial summary judgment (D.E. 30) be denied. The following specific recommendations are made:

(1) Judgment should be entered for defendants on plaintiffs Moreno and Garcia's FLSA causes of action;

(2) Plaintiff Moreno should be allowed to proceed on his hostile environment and constructive discharge causes of action but judgment should be entered for defendants on Moreno's other causes of action based on discrimination;

(3) Plaintiff Garcia should be allowed to proceed on his hostile environment cause of action but judgment should be entered for defendants on his remaining causes of action based on discrimination;

(4) Plaintiff Pena should be allowed to proceed on his hostile environment cause of action but judgment should be entered for defendants on his remaining causes of action based on discrimination;

(5) Plaintiff Gonzalez should be allowed to proceed on his hostile environment and constructive discharge causes of action, but judgment should be entered for defendants on any remaining causes of action based on discrimination;

(6) Plaintiff Hernandez should be allowed to proceed on his hostile environment and constructive discharge causes of action, but judgment should be entered for defendants on any remaining causes of action based on discrimination;

(7) Plaintiff Montemayor should be allowed to proceed on his hostile environment and constructive discharge causes of action, but judgment should be entered for defendants on any remaining causes of action based on discrimination.